IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

BETTY ANN BRACKEE,

                              Plaintiff,

      v.

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security,

                              Defendant.

OPINION AND ORDER

20-cv-380-slc

_____

      Plaintiff Betty Ann Brackee seeks judicial review of a final decision of defendant, Commissioner of the Social Security Administration, finding Brackee not disabled within the meaning of the Social Security Act. Brackee contends that the administrative law judge (ALJ): (1) failed to cite sound reasons for rejecting the opinion of Brackee's treating neurologist, Dr. Ray; (2) failed to explain how she reached her conclusions about Brackee's ability to use her upper extremities; (3) failed to include limitations to account for Brackee's obesity, headaches, and fatigue; and (4) cited unsound reasons for discrediting Brackee's subjective complaints.

      As discussed below, I conclude that the ALJ drew unfounded conclusions from the evidence that tainted her assessment of Dr. Ray's opinion, which in turn affected the ALJ's residual functional capacity assessment. Accordingly, I am remanding this case to the commissioner for that reason (although I also will briefly address Brackee's remaining claims).

_____

      [1] The court has changed the caption to reflect Kilolo Kijakazi's appointment as acting commissioner.

BACKGROUND

## I.  Significant Medical Evidence

Plaintiff Betty Ann Brackee, then 40 years old, was hospitalized on July 2, 2015 with neurological symptoms including decreased sensation in her chest and lower extremities, numbness and tingling in her upper extremities, problems with gait and balance, and decreased coordination in her upper extremities.  After a full workup, she was diagnosed with acute transverse myelitis, an inflammation of both sides of one section of the spinal cord that often damages the myelin sheath covering the nerve cell fibers.  *See* https://www.mayoclinic.org/ diseases-conditions/transverse-myelitis/symptoms-causes/syc-20354726 (last visited September 9, 2021).

After a course of corticosteroids and physical therapy, Brackee's symptoms improved significantly but did not vanish.  In August 2015, Brackee developed tonic spasms where she would feel severe tightening between her chest and jaw with tingling and increased clumsiness in her arm.  At a January 20, 2016 follow-up with her treating neurologist, Dr. Shana Vifian Ray, Brackee reported that an anti-seizure medication (carbamazepine) had helped to control the tonic spasms, but that  she continued to have painful, debilitating sensations of numbness, tingling and vibrations in both her upper and lower extremities that worsened with any kind of activity, including walking and household tasks.  AR 637.  On physical exam, Dr. Ray noted that Brackee had improved since her symptoms had first appeared and had normal strength in her biceps, triceps and deltoid.  However, Brackee still had some mild weakness in her hands and lower extremities; parasthesias to light touch in the upper extremities; some difficulty with tandem gait; and some impaired coordination bilaterally in her upper extremities.  AR 636. Dr. Ray started Brackee on Lyrica and continued her prescription for carbamazepine.

Dr. Ray saw Brackee in follow up on April 27, 2016.  AR 812-14.  Dr. Ray noted that Brackee was doing reasonably well and her symptoms were stable, but she continued to have

2

"significant impairment due to painful paresthesias." AR 814.  On examination, Dr. Ray again noted mild weakness in Brackee's hands and lower extremities; parasthesias to light touch in the upper extremities; some difficulty with tandem gait; some impaired coordination bilaterally in her upper extremities; and reduced hand dexterity.  *Id*.  Dr. Ray increased Brackee's Lyrica dosage.  She noted that the carbamazepine was "continuing to work well to control the tonic spasms," adding that Brackee had been unable to tolerate a higher dose due to sedation.  *Id*.

That same day, Dr. Ray completed a residual functional capacity questionnaire for Brackee.  AR 728-31.  Dr. Ray indicated that Brackee had neuropathic pain due to transverse myelitis that affected both her upper and lower extremities, worsened with activity, and was severe at times, further noting that she had weakness, numbness and a lack of coordination. Dr. Ray opined that Brackee could sit for an hour at a time for a total of at least six hours of an eight-hour workday, but could never lift even less than 10 pounds, and could only stand or walk for fewer than 2 hours total.  Further, opined Dr. Ray, Brackee was significantly limited in the use of her upper extremities: in an eight-hour workday, Brackee could use her hands to twist, grasp, or turn objects five percent of the time; could only use her arms for reaching in any direction, including overhead, five percent of the time; and could not perform any fine finger manipulation.  Dr. Ray further opined that Brackee would have "good" days and "bad" days, and was likely to miss more than four days of work each month as a result of her impairments. Brackee continued to see Dr. Ray every three to six months until December 2017.

In September 2018, Brackee was evaluated by Dr. Melissa Kuan, a rheumatologist, for complaints of joint pain.  AR 1159.  Brackee reported that in May 2018, she started having pain in different joints including the base of her neck, hands, wrists, knees, feet, ankles and hips.  Her pain was most severe in the hands and wrists, which had some swelling.  Brackee said she also had stiffness that usually lasted two hours and improved with movement, while her pain improved with rest and NSAIDs.  Based on the description of her symptoms and examination,

3

Dr. Kuan suspected Brackee's pain was inflammatory in nature. Although an autoimmune workup and MRI both were unremarkable, Dr. Kuan surmised that Brackee had an underlying inflammatory arthropathy most likely secondary to seronegative rheumatoid arthritis. AR 1212-13.  Dr. Kuan prescribed methotrexate and folic acid, AR 1212, which Brackee began taking in early December 2018.  AR 1202.

## II. Administrative Proceedings

Brackee applied for disability insurance benefits and supplemental security income on November 15, 2015, alleging that she had been unable to work since June 29, 2015.  A state agency medical consultant who reviewed Brackee's application opined that Brackee retained the residual functional capacity to perform the full range of light work, provided that the work did not require frequent climbing of ladders, ropes or scaffolds or concentrated exposure to work hazards like machinery or heights.  AR 103-04.  On reconsideration in October 2016, a different consultant opined that Brackee had the residual functional capacity for only sedentary work. AR 119-20.  Neither consultant found that Brackee had any manipulative limitations.

After Brackee's disability application was denied initially and on reconsideration, she requested an administrative hearing, which was held on November 29, 2018 before ALJ Kathleen Kadlec.  AR 47.  Brackee testified that she could not work because her body felt like it was "being electrified at all times," she was in constant pain, she had poor coordination and her joints were stiff.  AR 58.  She said her pain was typically a 7.5 but her medications reduced it to about a 5.   Brackee said the more she moved, the worse the tingling sensation and her coordination became, which caused her to drop things. AR 62.  Brackee said she was able to do household chores like unloading the dishwasher and folding clothes, but she had to take periodic breaks to allow the tingling to subside.  AR 62.  She could shop for about 20 minutes before needing to stop to allow her nerves to "calm down."  AR 65.  Brackee said she gets spasms two

to three times a week during which her hands clench up, but the episodes are not as intense as they were before she was prescribed anti-seizure medication.  AR 67-68.

The ALJ asked a vocational expert to consider a hypothetical person with Brackee's age, education, and work history, who could perform sedentary work, use foot controls occasionally, use hand controls frequently, perform handling, fingering and feeling frequently, and who could frequently reach in all directions except overhead, which she could do only occasionally.[2]  AR 76.  The expert opined that this person could not perform Brackee's past work but could perform a number of other jobs that existed in significant numbers in the national economy, including telephone order clerk, charge account clerk and final assembler.  AR 77.  The expert further testified that no work in the national economy would be available if reaching, handling, fingering and feeling were reduced from "frequent" to "occasional."  AR 78.

In a May 24, 2019 decision, the ALJ found that Brackee was not disabled.  AR 17-33. Applying the five-step sequential process for evaluating disability claims, 20 C.F.R. §§ 404.1520, 416.920, the ALJ determined that:  (1) Brackee had not worked during the claim period; (2) she had the severe impairments of transverse myelitis, degenerative disc disease of the lumbar and thoracic spine, osteoarthritis in both feet and the right knee, and inflammatory arthritis; (3) none of these impairments, whether considered singly or in combination, was severe enough to be presumptively disabling; (4) Brackee's impairments prevented her from performing her past relevant work as a quality technician, pizza baker, disc jockey, or bartender; and (5) she was able to make a vocational adjustment to a number of jobs existing in significant numbers in the national economy.

---

[2] The ALJ included a number of additional exertional limitations, such as restrictions on balancing, stooping, kneeling, crouching and crawling, but none of those appear to be in dispute.

As a predicate to her findings at steps four and five, the ALJ found that Brackee retained the residual functional capacity to perform a reduced range of sedentary work, with the additional limitations she had asked the VE to consider at the hearing. AR 31. With respect to the medical opinions, the ALJ found the state agency consultants' opinions "appropriate given the time they were prepared," but explained that the overall record, including Brackee's 2018 treatment, better supported a more limited residual functional capacity, including limitations on reaching, handling, and fingering. AR 30. Finding that Brackee could perform these activities on a "frequent" basis, the ALJ specifically rejected Brackee's argument that she was limited to only occasional handling, fingering and feeling, finding that "her symptoms do not appear to functionally limit her to the degree claimed." AR 28. The ALJ also rejected Dr. Ray's restrictive opinion, finding it lacked objective support and was inconsistent with other evidence. AR 30-31. The Appeals Council denied Brackee's appeal, making the ALJ's decision the final decision of the commissioner for purposes of judicial review.

OPINION

This court must uphold the ALJ's decision if it is supported by substantial evidence, that is, "sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The threshold for sufficiency is not high; the substantial evidence standard requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014); *see also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("[T]he ALJ must ... explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review.").

All of Brackee's challenges in this appeal are directed at the ALJ's residual functional capacity assessment. Brackee argues that the ALJ's RFC assessment is defective because the ALJ:

> (1) Failed to cite sound reasons for rejecting Dr. Ray's opinion;
>
> (2) Failed to cite substantial evidence in support of her conclusions about Brackee's ability to use her upper extremities;
>
> (3) Failed to include limitations to account for Brackee's obesity, headaches, and fatigue; and
>
> (4) Failed to cite sound reasons for discrediting Brackee's subjective complaints.

## I. Dr. Ray's Opinion

Brackee first contends that the ALJ erred in rejecting April 2016 residual functional assessment from Dr. Ray, her treating neurologist. Under the treating physician rule in effect at the time of Brackee's application, the ALJ had to give a treating physician's opinion controlling weight if it was "well-supported and not inconsistent with other substantial evidence." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); 20 C.F.R. § 404.1527(c)(2)-(6). If the ALJ does not give controlling weight to a treating physician's opinion, then the ALJ has to assign it a weight based on factors such as the length and nature of the physician-patient relationship, the opinion's consistency with the record and the physician's area of specialty. 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018). An ALJ who chooses not to credit a treating source's opinion must offer "good reasons" for not doing so. *Stage*, 812 F.3d at 1126; 20 C.F.R. § 404.1527(c).

Here, the ALJ determined that Dr. Ray's opinion was deserving of only "little weight" because: (1) it was contradicted by the September 26, 2018 report from the rheumatologist, Dr. Kuan, who noted that Brackee had said her joints had been "ok" until May 2018; (2) it was not supported by Dr. Ray's own objective findings, particularly her note that Brackee was doing "reasonably well" and the carbamazepine was controlling the tonic spasms; (3) it was

inconsistent with later exams and symptoms reports documenting "limited issues" with Brackee's hips, ankles, and back unless walking; and (4) it was inconsistent with later reports from Dr. Kuan that only sometimes noted swelling and range of motions deficits in Brackee's hands, and this was before Brackee was prescribed methotrexate in November 2018.  AR 30.

I agree with Brackee that the ALJ's rationale for rejecting Dr. Ray's opinion suffers from a number of logical flaws, particularly with respect to her opinions concerning Brackee's ability to use her upper extremities.  First, as Brackee points out, the ALJ failed to appreciate that Brackee saw Dr. Kuan for inflammatory joint pain – a rheumatic condition – whereas Dr. Ray treated her for transverse myelitis – a neurological condition.  As Brackee explained at the hearing, the joint pain and swelling for which Dr. Kuan prescribed methotrexate developed later and differed from the numbness, tingling and other residual neurological deficits that remained after Brackee's bout of transverse myelitis, for which she was treated by Dr. Ray.  Therefore, it was a non sequitur for the ALJ to find the weight of Dr. Ray's opinions concerning Brackee's myelitis-related deficits had been "diminished" by Dr. Kuan's notes and treatment, which addressed a different medical problem.

Second,  Dr. Ray's statements that Brackee was doing "reasonably well" and that her tonic spasms were controlled on the carbamazepine do not plainly contradict Dr. Ray's opinions concerning Brackee's exertional and manipulative limitations, which she offered the same day.  As the Seventh Circuit has noted, "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce[.]"  *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *see also Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), as amended (Aug. 20, 2014) ("The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled.").  That Brackee may have been doing "reasonably well" 10 months after first receiving treatment for her transverse myelitis says nothing about her functional limitations.

As Brackee notes, in spite of doing "reasonably well," she still had a number of abnormal findings, including weakness with bilateral handgrip, paresthesias to light touch, impaired coordination in the upper extremities and reduced dexterity of the hands.  Further, at that same visit, Dr. Ray *increased* Brackee's dosage of Lyrica, which suggests that Brackee's functioning was less than optimal.  As for the carbamazepine, that medication was prescribed to control Brackee's tonic-type muscle spasms, which was different from the numbness and tingling she also reported. Moreover, Dr. Ray noted that she had attempted to increase the dose of the carbamazepine but Brackee could not tolerate the side effects.  The logical inference to draw from this is that Brackee's spasms were not completely eliminated by the dose she could tolerate.

Third, the ALJ appeared to conclude that Dr. Ray's opinions concerning Brackee's upper extremity limitations were contradicted by Brackee's statement to Dr. Kuan that the stiffness in her hands usually lasted two hours and improved with movement, and the pain improved with rest and NSAIDS.  AR 28, citing 23F.  Once again, however, the ALJ overlooked the distinction between the joint pain and stiffness for which Brackee saw Dr. Kuan and the nerve-related issues for which she had previously seen Dr. Ray.  Nothing in the record suggests that Brackee's myelitis-related deficits in her hands (numbness, tingling, and lack of coordination) improved with movement or with NSAIDS.  In fact, Brackee testified at the hearing that the more she uses her hands, the worse the tingling and coordination gets.

As for Dr. Ray's opinions concerning Brackee's use of her lower extremities, the ALJ's decision has more support.  As the ALJ noted, Dr. Ray found on examination that Brackee's gait was steady overall and she had normal sensation in the lower extremities.  In fact, even Dr. Ray thought Brackee capable of sitting for up to six hours a day, which is largely consistent with the ALJ's finding that Brackee could perform sedentary work.  Nevertheless, Dr. Ray opined that Brackee could not stand or walk for a total of two hours as generally required of sedentary work, and she further thought Brackee needed the ability to sit or stand at will, a limitation that the

ALJ did not include in her RFC or corresponding hypothetical to the VE.  Perhaps the ALJ would have these credited these opinions had she not erred by placing undue weight on Brackee's alleged "improvement" with medication or failing to recognize that Brackee's neurological symptoms were different from her rheumatologic symptoms.  Accordingly, although my misgivings about this aspect of the ALJ's decision are not acute, when considering on remand how much weight to give Dr. Ray's opinion, the ALJ should reconsider Dr. Ray's April 27, 2016 opinion in its entirety.[3]

## II.  Brackee's Remaining Challenges

Because I am remanding this case for other reasons, I only briefly consider Brackee's remaining claims of error.  First, Brackee argues that the ALJ failed to include limitations in the RFC assessment to account for her obesity, headaches, and fatigue.  This argument is not persuasive.  The ALJ discussed each of these alleged impairments in her decision and explained why they did not affect Brackee's ability to work.  Specifically, with respect to obesity, the ALJ recognized that Brackee's BMI placed her in the Level II category, but noted she did not consistently complain of fatigue or shortness of breath, generally presented in no acute distress, had a normal gait, musculoskeletal exams were largely normal, and no provider had opined that her obesity was exacerbating any other conditions.  AR 22.  Brackee does not contest the accuracy of these findings, which have substantial support in the record.  Moreover, Brackee generally did not report problems with sitting, except for the need to change position on occasion.  On remand, the ALJ should reconsider all of Brackee's alleged limitations in light of her impairments, including whether she requires the ability to sit or stand as needed.  However,

---

[3] In light of this conclusion, it is unnecessary to consider Brackee's related argument that the ALJ failed to build an adequate bridge between the evidence and her conclusions regarding Brackee's ability to perform reaching, handling, and fingering.

the ALJ's alleged failure to properly consider Brackee's obesity is not an independent ground for remand.

The same is true of Brackee's alleged headaches and fatigue. The ALJ thoroughly addressed the medical evidence concerning her headaches, which were thought to be related to a 6x5 mm brain aneurysm that was discovered in the course of Brackee's workup for transverse myelitis. The ALJ noted that the aneurysm was monitored and stable, and that, although Brackee reported headaches, she did not seek or receive treatment for them. AR 20. As the ALJ further noted, at July 2, 2018 follow up for her aneurysm, Brackee said she still occasionally got a headache that typically lasted a few hours and was promptly relieved by Tylenol or ibuprofen. AR 20 (citing AR 1143). This evidence reasonably supports the ALJ's conclusion that no further reduction in the RFC was required to accommodate Brackee's headaches.

As for Brackee's alleged fatigue, the ALJ noted that she was found to be anemic in February 2018, but improved with iron supplementation, and that she did not consistently complain of fatigue or shortness of breath. AR 21. Further, noted the ALJ, to the extent Brackee's fatigue might impose a mild limitation on her ability to work, it was accommodated by the limitation to sedentary work. AR 22. Overall, the ALJ's decision reflects that she considered the pertinent evidence concerning Brackee's fatigue and built an accurate bridge between that evidence and her conclusion that it would not prevent Brackee from performing sedentary work.

Finally, I agree with Brackee that the ALJ drew a number of unfounded conclusions from the record in declining to fully credit Brackee's subjective complaints regarding her symptoms. The ALJ found that although Brackee had ongoing problems with painful paresthesias, tonic spasms, and altered coordination, these problems were not as severe as she alleged because "prescribed treatment and medications have improved the claimant's condition." AR 27. As noted previously, however, the fact that Brackee "improved," without more, is too vague to

11

establish that Brackee is capable of performing the kinds of work allowed by the ALJ's RFC. The ALJ further thought that Brackee's subjective complaints were contradicted by her daily activities, which consisted of some basic meal preparation, personal grooming, household chores, and shopping once or twice weekly, but Brackee testified she performed these activities for only a few minutes at a time with rest breaks. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time.").

Finally, as the government concedes, the ALJ was incorrect in finding that Brackee "stopped working due to a layoff rather than because of the allegedly disabling impairments," AR 24; as Brackee points out, she testified that she was laid off work in April 2015, two months before her sudden onset of transverse myelitis on June 29, 2015, which was the date on which she alleged her disability began. At this juncture, I need not determine whether these errors in the credibility assessment would suffice on their own to remand this case.

### ORDER

IT IS ORDERED that the decision denying benefits to plaintiff Betty Ann Brackee is REVERSED, and this case is REMANDED to defendant Kilolo Kijakazi, Acting Commissioner of Social Security, for further proceedings consistent with this opinion.

Entered this 23rd day of September, 2021.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge